UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| NORTH CAROLINA INSURANCE GUARANTY ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, and CENTER FOR MEDICARE AND MEDICAID SERVICES,<br><br>Defendants. | Civil Action No. 5:24-cv-00042 |

## COMPLAINT

Plaintiff North Carolina Insurance Guaranty Association (the "NCIGA") brings this action against Defendants Xavier Becerra, in his official capacity as Secretary of the United States Department of Health & Human Services ("DHHS"), the United States Department of Health and Human Services, and the Center for Medicare and Medicaid Services ("CMS") under the Administrative Procedures Act, 5 U.S.C. § 706, and Review of Determination, 42 U.S.C. § 405(g) and § 1395ii.

## NATURE OF CASE

1. Through this case, the NCIGA seeks a determination of the controversy that the NCIGA is not a "primary plan" under the federal Medicare Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b). The NCIGA is a statutory entity arising and existing under North Carolina law that provides a limited form of protection to insureds and claimants, as a recovery source of last resort, when an insurance company become insolvent. The NCIGA is not primary to Defendants

under the wording and purpose of the MSP and is therefore not obligated to reimburse Defendants under the MSP as a "primary plan."

2. The NCIGA brings this action in relation to an MSP reimbursement request from the Government to the NCIGA. The NCIGA denies that it is obligated to reimburse the Government in connection with this claim, and the administrative decision requiring reimbursement should be reversed because it is based on legal error and not supported by substantial evidence. Specifically, the administrative decision incorrectly finds that the NCIGA is a "primary plan." As described more fully below, the NCIGA has standing to pursue its claims because it has suffered, and continues to suffer, an injury in fact in relation to the controversy between the parties based on Defendants' position that the NCIGA is a "primary plan." The NCIGA's claims are ripe for adjudication in this action because the NCIGA has channeled its claims through the Medicare appeal process and has exhausted its appeal rights prior to the commencement of this action.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 405(g), 42 U.S.C. § 1395ii, and 42 U.S.C. § 1395y(b).

4. Defendants have waived sovereign immunity pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1395ii.

5. Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(e) because this is the judicial district in which the NCIGA is located and resides (where no real property is involved) and where a substantial part of the events or omissions giving rise to the claim occurred.

-2-

Case 5:24-cv-00042-M   Document 1   Filed 01/25/24   Page 2 of 14

## PARTIES

6. The NCIGA is a statutorily created, involuntary, unincorporated association whose members consist of those insurers admitted to transact certain classes of insurance business in the State of North Carolina and who write insurance to which the North Carolina Insurance Guaranty Association Act, N.C. Gen. Stat. § 58-48-1, *et. seq* (the "Guaranty Act"), applies. The NCIGA's principal place of business is located in this District, specifically at 2910 Sumner Boulevard, Raleigh, North Carolina 27616.

7. Defendant Xavier Becerra ("Becerra") is the current Secretary of the DHHS. In this capacity, Becerra is responsible for the management and operation of the DHHS, including the statutory provisions that are the subject of this lawsuit. Becerra is sued in his official capacity only.

8. Defendant DHHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the statutory provisions that are the subject of this lawsuit.

9. Defendant CMS is an executive agency operating under the auspices of the DHHS and is responsible for the administration of a variety of DHHS programs including the statutory provisions that are the subject of this lawsuit.

## GENERAL ALLEGATIONS

**A.     Background On The NCIGA**

10. The NCIGA was created by the North Carolina General Assembly in 1971 pursuant to the Guaranty Act to establish a fund from which insureds and claimants could obtain limited statutory benefits in the event a member insurer became an "insolvent insurer" as defined by the Guaranty Act. Broadly speaking, the statutory obligation of the NCIGA pursuant to the Guaranty Act is to provide certain statutory protections arising out of an insurance insolvency by paying

-3-

Case 5:24-cv-00042-M   Document 1   Filed 01/25/24   Page 3 of 14

certain defined "covered claims" arising out of an insurance policy of an insolvent insurer. The NCIGA depends on the provisions of the Guaranty Act for its existence and for the establishment of its powers, duties and obligations. As a creature of statute created by the North Carolina General Assembly, the NCIGA has only those duties and obligations as set forth in the Guaranty Act and interpretive case law from North Carolina's appellate courts.

11.     Pursuant to the Guaranty Act, the NCIGA is an involuntary, unincorporated association of certain specified lines of insurance issued by insurers who are admitted to transact insurance and write insurance in North Carolina to which the Guaranty Act applies. Each such liability insurer is required to be a member of the NCIGA as a condition of its authority to transact insurance in North Carolina. The Guaranty Act provides a mechanism by which the NCIGA may assess its members to finance the NCIGA's payment, adjustment and defense of "covered claims" as defined under the Guaranty Act. The NCIGA does not collect assessments from its members for the payment of claims that do not meet the definition of a "covered claim."

12.     The NCIGA's member insurers recoup the net costs of assessments paid to the NCIGA through premium tax offsets over a period of five years from the date of when the gross assessments are paid for the specific insurer insolvency involved. Because the premium tax offsets reduce the overall tax revenue of the State of North Carolina, the burden of financing insurer insolvencies within this State is ultimately borne by all North Carolina taxpayers who indirectly finance the costs of the administration and payment of "covered claims" through their tax payments.

13.     The NCIGA was created to provide a limited form of protection to North Carolina claimants and insureds that certain liability claims will be paid in the event of the insolvency of a

member insurer. The NCIGA issues no insurance policies, collects no premiums, makes no profits, and assumes no contractual obligations to any insureds of an insolvent insurer.

14. The NCIGA's statutory obligations do not include the payment of all losses that result from insurance company insolvencies. When the NCIGA pays "covered claims" under the Guaranty Act, it only undertakes the fulfillment of its limited statutory obligations, and the NCIGA is only deemed to be the insurer to the extent of the NCIGA's obligations on "covered claims." N.C. Gen. Stat. § 58-48-35(a)(2). The NCIGA is specifically authorized and directed by the Guaranty Act to pay "covered claims," and to deny all other claims. N.C. Gen. Stat. § 58-48-35(a)(4).

15. The NCIGA is not the legal successor to any insolvent insurer. Instead, the legal successor to each insolvent insurer is the court-appointed liquidator of that insolvent insurer as appointed in the state of domicile of the insolvent insurer.

16. Therefore, the scope of the NCIGA's statutory duties under the Guaranty Act are limited by the definition of a "covered claim," which provides:

> "Covered claim" means an unpaid claim, including one of unearned premiums, which is in excess of fifty dollars ($50.00) and arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Article applies as issued by an insurer, if such insurer becomes an insolvent insurer after the effective date of this Article and (i) the claimant or insured is a resident of this State at the time of the insured event; or (ii) the property from which the claim arises is permanently located in this State. "Covered claim" shall not include any amount awarded (i) as punitive or exemplary damages; (ii) sought as a return of premium under any retrospective rating plan; or (iii) due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation or contribution recoveries or otherwise. "Covered claim" also shall not include fines or penalties, including attorneys fees, imposed against an insolvent insurer or its insured or claims of any claimant whose net worth exceeds fifty million dollars ($50,000,000) on December 31 of the year preceding the date the insurer becomes insolvent.

N.C. Gen. Stat. § 58-48-20(4).

17. Because the NCIGA's statutory obligations for "covered claims" are not co-extensive with the insolvent insurer's obligations under its policies, the NCIGA does not and cannot "stand in the shoes" of the insolvent insurer for all purposes. In fact, the NCIGA is expressly forbidden from doing so, except when a claim meets all of the requirements of a "covered claim" and is otherwise within the NCIGA's payable statutory obligations under the Guaranty Act.

**B.    Background On Medicare Secondary Payer Act.**

18. The "Medicare Secondary Payer" statute, 42 U.S.C. § 1395y(b) ("MSP"), provides that the Medicare Trust Fund ("Medicare") shall be the "secondary" payer for medical items and services otherwise covered under Medicare where payment "has been made, or can reasonably be expected to be made" under a group health plan, or workers' compensation plan, automobile or liability policy or plan (including self-insured plan) or under no fault insurance. 42 U.S.C. § 1395y(b)(2)(A)(i) and (ii).

19. Congress permits Defendants to make conditional payments for items or services, and then seek reimbursement from "primary plans." The MSP requires "primary plans" to reimburse Medicare for any payment made by Medicare with respect to an item or service "if it is demonstrated that a primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii).

20. The MSP, as well as applicable regulations promulgated by CMS, including but not limited to 42 C.F.R. § 411.21, defines "primary plan" as a group health plan or large group health plan, a workers' compensation policy or plan, an automobile or liability policy or plan, or no-fault insurance. 42 C.F.R. § 411.21; 42 U.S.C. § 1395y(b)(2)(A). The NCIGA does not meet any of the requirements to qualify as a primary plan, and as such, does not have a demonstrated responsibility to reimburse Medicare, or any other entity, for conditional payments.

21. The NCIGA is not a workers' compensation insurer, an automobile insurer, a liability insurer, or a no-fault insurer. The NCIGA issues no policies, collects no premium, and insures no risks. The NCIGA is instead created by a distinct statutory scheme for insurer insolvencies, and the NCIGA is triggered solely by an insurance insolvency, not by a work-related injury or an automobile or other accident. Further, pursuant to its statutory obligations under the Guaranty Act, the NCIGA may only pay the limited and statutorily defined "covered claims" available under the Guaranty Act following the insolvency of a member insurer.

C.  **The Instant Controversy Concerning Whether The NCIGA Is A "Primary Plan."**

22. In 2017, the NCIGA activated to fulfill its statutory obligations in connection with the insolvency of Guarantee Insurance Company ("GIC"), a Florida insurer that was declared insolvent in an Order of Liquidation dated November 27, 2017.

23. As a result of the GIC insolvency, the NCIGA became obligated for the workers' compensation claim of a North Carolina resident (the "Claimant") as a "covered claim" under the Guaranty Act. The Claimant injured her lower back in a workplace accident that occurred on April 28, 2014. Pursuant to its statutory obligations, the NCIGA administered the Claimant's claim following GIC's insolvency and paid her indemnity benefits within the NCIGA's statutory obligations under the Guaranty Act.

24. By letter dated December 2, 2020, from Medicare's Commercial Repayment Center ("CRC"), Medicare sent an initial demand letter to the NCIGA for reimbursement under the MSP in the amount of $12,770.00. A true and correct copy of the CRC's December 2, 2020 demand letter is attached hereto as **Exhibit A**.

25. On December 22, 2020, the NCIGA submitted a request for redetermination appeal to the CRC.

-7-

Case 5:24-cv-00042-M   Document 1   Filed 01/25/24   Page 7 of 14

26. On February 10, 2021, the CRC issued a partially favorable decision to the NCIGA and reduced the amount of Medicare's reimbursement demand under the MSP to $467.40. A true and correct copy of the CRC's partially favorable decision is attached hereto as **Exhibit B**.

27. On March 31, 2021, the NCIGA issued a check in the amount of $467.40 to the CRC, under protest and without prejudice to the NCIGA's appeal rights, to avoid further interest being imposed on the amount sought by Medicare as reimbursement under the MSP.

28. On July 28, 2021, the NCIGA requested reconsideration review with Medicare's Qualified Independent Contractor, C2C Innovative Solutions, Inc. (the "QIC"). On September 27, 2021, the QIC issued a decision unfavorable to the NCIGA finding that Medicare was the secondary payer and entitled to recoupment of funds from the NCIGA. A true and correct copy of the QIC's unfavorable decision is attached hereto as **Exhibit C**.

29. On November 15, 2021, the NCIGA appealed the decision of the QIC and requested a hearing before an Administrative Law Judge on the legal issue of whether the NCIGA is a "primary plan" for purposes of the MSP.

30. The Administrative Law Judge conducted a hearing on March 17, 2022, and issued a decision unfavorable to the NCIGA. A true and correct copy of the Administrative Law Judge's unfavorable decision is attached hereto as **Exhibit D**.

31. On August 9, 2022, the NCIGA filed its appeal of the decision of the Administrative Law Judge to the Medicare Appeals Council ("MAC"). A true and correct copy of the NCIGA's appeal to the MAC is attached hereto as **Exhibit E**.

32. Review by the MAC is the final step of the four-step Medicare appeal process. Pursuant to both statute and regulation, the MAC was required to issue its decision on the NCIGA's

appeal within 90 days of the filing of the NCIGA's appeal. 42 U.S.C. § 1395ff(d)(2)(A); 42 C.F.R. § 405.1100(c).

33. Following the expiration of the 90-day period for the MAC to rule on the NCIGA's appeal, the NCIGA sent a request for escalation of its appeal to federal district court on July 17, 2023, pursuant to 42 C.F.R. § 405.1132(a) and (b). A true and correct copy of the NCIGA's July 17, 2023, request for escalation is attached hereto as **Exhibit F**.

34. After not receiving any response from the MAC to its request for escalation dated July 17, 2023, the NCIGA sent the MAC a second request for escalation to federal district court dated August 15, 2023. A true and correct copy of the NCIGA's August 15, 2023, second request for escalation is attached hereto as **Exhibit G**.

35. By Notice and Order entered on December 7, 2023, the MAC notified the NCIGA that the MAC was granting the NCIGA's request for escalation to federal district court. A true and correct copy of the MAC's Notice and Order dated December 7, 2023, is attached hereto as **Exhibit H**.

36. A present, actual and justiciable controversy exists between the NCIGA and Defendants as to whether the NCIGA is a "primary plan" under the MSP that is obligated to reimburse Medicare in connection with the Claimant's claim.

37. The NCIGA has standing to bring this claim as it is a party aggrieved by Medicare's secondary payer reimbursement request in connection with the Claimant's claim, and the NCIGA has suffered an injury in fact. Medicare contends, and the administrative law judge wrongfully concluded, that the NCIGA is a "primary plan" under the applicable statutes that is obligated to reimburse Medicare in the amount of $467.40 in relation to the Claimant's workers' compensation claim.

38. The NCIGA's claim that it is not a "primary plan" for purposes of the MSP is ripe for consideration by this Court because the NCIGA has fully exhausted its appeal rights under the Medicare appeal process. As the NCIGA's appeal to the MAC was the last step in the four-step Medicare appeal process, and the MAC has granted the NCIGA's request to escalate its appeal to federal district court, the NCIGA is entitled to commence this action seeking judicial review by this Court of the legal issue of whether the NCIGA is a "primary plan" for purposes of the MSP.

39. The determination sought by the NCIGA in this action is consistent with the decision of the Ninth Circuit Court of Appeals in *California Ins. Guar. Ass'n v. Azar*, 940 F. 3d 1061 (9th Cir. 2019), in which the Ninth Circuit determined that the California Insurance Guarantee Association ("CIGA") – a statutory entity with the same fundamental statutory attributes as the NCIGA – was not a "primary plan" for purposes of conditional payment claims under the MSP. Since the Ninth Circuit's decision in *Azar*, Medicare has extended the effects of that decision to other state insurance guaranty associations within the Ninth Circuit for the States of Hawaii, Alaska, Washington, Oregon, Idaho, Montana, Nevada and Arizona, confirming that those state insurance guaranty associations: (a) are not "primary plans" for purpose of the MSP; and (b) no longer have any obligation to submit reporting under Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 ("Section 111"). 42 U.S.C. § 1395y(b)(8). A true and correct copy of correspondence dated July 20, 2023 from CMS to counsel for the Oregon Insurance Guaranty Association is attached hereto as **Exhibit I**. Upon information and belief, similar correspondence has been sent to other state insurance guaranty associations within the Ninth Circuit.

40. Based on the same reasoning adopted by the Ninth Circuit in *Azar*, this Court should adjudge and determine that the NCIGA is not a "primary plan" for purposes of reimbursement

requests by Medicare under the MSP and thereby reverse the administrative decision. The relevant requirements of the Guaranty Act are equivalent to the California statute governing CIGA and its obligations upon the insolvency of an insurer. No reason exists to apply any different standard to the NCIGA than has already been applied by Defendants to CIGA and the other state insurance guaranty associations within the Ninth Circuit.

41. The NCIGA's claim in this action satisfies the amount in controversy requirement for judicial review in this Court. Determination of the amount in controversy is not limited to the $467.40 at issue in connection with the Claimant's claim. The controversy in this action does not concern, and is not tethered to, the amount that was the subject of the Defendants' MSP reimbursement request to the NCIGA in connection with the Claimant's claim. Rather, the controversy in this action involves the legal question of whether the NCIGA is a "primary plan" for purposes of the MSP, and with respect to that legal question, the NCIGA has fully exhausted its appeal rights through the Medicare appeal process.

42. Moreover, and because of the Defendants' position that the NCIGA is a "primary plan", the NCIGA has and will continue to incur costs and expenses associated with Section 111 reporting as a "primary plan". Specifically, in 2023, the NCIGA incurred over $42,000 in expenses to comply with Section 111 reporting obligations, and such expenses will continue into the future until the legal question of whether the NCIGA is a "primary plan" is decided. As shown by the letter to counsel for the Oregon Insurance Guaranty Association attached hereto as **Exhibit I**, the Defendants have recognized and acknowledged that the determination of whether a state insurance guaranty association is a "primary plan" impacts both reimbursement requests under the MSP and the obligation to provide Section 111 reporting. As a result, the costs incurred by the NCIGA in

-11-

Case 5:24-cv-00042-M   Document 1   Filed 01/25/24   Page 11 of 14

2023 to comply with Section 111 should appropriately be considered as part of the amount in controversy in this case.

43. Any argument by Defendants that this Court lacks subject matter jurisdiction the Medicare amount in controversy requirement is not satisfied because the dispute is limited to the $467.40 MSP reimbursement request at issue in the Claimant's claim: (a) does not accurately reflect the full amount in controversy between the parties because of Defendants' position that the NCIGA is a "primary plan"; and (b) would completely deny the NCIGA access to judicial review of the legal issue of whether the NCIGA is a "primary plan" under the MSP.

### FIRST CLAIM FOR REVERSAL OF ADMINISTRATIVE DECISION
**(Violation of Administrative Procedures Act, 5 U.S.C. § 706)**

44. The NCIGA incorporates by reference each and every allegation in Paragraphs 1 through 56 as though fully set forth herein.

45. Defendants' determinations that the NCIGA is a "primary plan" in connection with the Claimant's workers' compensation claim are final agency actions that are arbitrary, capricious, an abuse of discretion, and not in accordance with law, and the determinations should be reversed.

46. Defendants' actions described herein are in excess of the statutory jurisdiction, authority, limitations, or statutory right of Defendants under 42 U.S.C. § 1395y(b)(2) and 1395y(b)(8).

47. Defendants' actions described herein are without observance of procedure required by law.

48. The NCIGA is adversely affected, aggrieved, or suffering legal wrong as a result of Defendants' actions.

## SECOND CLAIM FOR REVERSAL OF ADMINISTRATIVE DECISION
**(Review of Determination Pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1395ii)**

49. The NCIGA incorporates by reference each and every allegation in Paragraphs 1 through 46 as though fully set forth herein.

50. The NCIGA is entitled to judicial review of Defendants' determinations that the NCIGA is a "primary plan" pursuant to 28 U.S.C. 42 U.S.C. § 405(g), as incorporated into the Medicare Act through 42 U.S.C. § 1395ii.

51. The NCIGA properly appealed the legal issue of whether the NCIGA was a "primary plan" that it was obligated to reimburse Medicare in relation to the Claimant's workers' compensation claim through each stage of the Medicare appeal process.

52. At the MAC and final level of appeal, the MAC granted the NCIGA's request to escalate its appeal to this Court.

53. As a result, the NCIGA has fully exhausted its administrative remedies and is entitled to judicial review by this Court.

54. The administrative decision should be reversed because it is based on legal error and is not supported by substantial evidence.

**PRAYER FOR RELIEF**

WHEREFORE, the NCIGA prays for a determination from the Court:

1. Adjudging and determining that the NCIGA is not a "primary plan" obligated to reimburse DHHS and CMS for "conditional" payments under the MSP;

2. Awarding the NCIGA its costs of suit incurred herein as allowed by law; and

3. For such other and further relief as the Court deems just and proper.

This the 25th day of January, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Christopher J. Blake
Christopher J. Blake
N.C. State Bar No. 16933
chris.blake@nelsonmullins.com
J. Matthew Gorga
N.C. Bar No. 56793
matt.gorga@nelsonmullins.com
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Phone: (919) 329-3800
Fax: (919) 329-3799

*Counsel for Plaintiff North Carolina Insurance Guaranty Association*